**MITCHELL FEED & SEED, INC., Appellant,**

v.

**Harold MITCHELL, a.k.a. Bud Mitchell, Respondent.**

No. C5–87–633.

Court of Appeals of Minnesota.

Oct. 20, 1987.

Barry Lazarus, Lazarus & Kelley, Minneapolis, for appellant.

James L. Wiant, Rinke, Noonan, Grote & Smoley, Ltd., St. Cloud, for respondent.

Heard, considered and decided by LANSING, P.J., and RANDALL and CRIPPEN, JJ.

## OPINION

LANSING, Judge.

Appellant Mitchell Feed & Seed, Inc., brought this action to recover on an alleged promise by respondent Harold ("Bud") Mitchell to pay his son's feed bills. The trial court ordered judgment for respondent, finding specifically that he had not promised to pay his son's feed bills and concluding that even if he had, any action on that promise would be barred by the statute of frauds. Both parties appeal from the order denying their motions for amended findings and appellant's motion for a new trial. We affirm.

## FACTS

In the spring of 1981, Bud Mitchell's son, Kent Mitchell, set up a hog-raising operation on the family farm. Bud Mitchell gave his son 20 acres of land and executed a written guarantee of the note, which

enabled Kent Mitchell to purchase the hogs.

The operation initially incurred losses of about $8,000, which made it apparent that more financing would be required. Testimony is unclear and conflicting on what happened next. Bob Mitchell, owner of Mitchell Feed & Seed, Inc., and bank officer Harley Privette testified that they attended a meeting with Bud Mitchell and his son at the bank which had financed the initial operation. Bud Mitchell and his son denied that Bob Mitchell attended the meeting, although they admitted meeting with Privette. The trial court found that the spring 1982 meeting was attended by Bud Mitchell, his son, bank officer Privette and Bob Mitchell.

The bank was reluctant to extend further credit to Kent Mitchell and wanted Bud Mitchell's assurance that his son's bills would be paid. Although Bud Mitchell refused to execute a written guarantee, the trial court found that he orally promised the bank that he would "stand behind" his son's debt to the bank. The trial court apparently did not credit the testimony of Bob Mitchell and Privette that Bud Mitchell also promised to guarantee the payment of the feed bill, because it found that Bud Mitchell did not orally guarantee the payment of the feed bill or guarantee any indebtedness other than that owed to the bank. Rather, the trial court found, based on a plan described in Privette's testimony, that the feed bill would be financed monthly through the bank loan.

The hog operation did not succeed, and in 1984 Kent Mitchell closed it down. Although Bob Mitchell and another witness testified that Bud Mitchell made subsequent oral assurances that he would stand behind his son's feed bill, Bud Mitchell denied having made any such promise, and the trial court found that no subsequent promise had been made. After Kent Mitchell went out of business, Mitchell Feed & Seed obtained a confession of judgment from him and only later brought this action against Bud Mitchell.

## ISSUES

1. Was the trial court's finding that respondent did not orally guarantee payment of his son's feed bill clearly erroneous?

2. Did the trial court clearly err in finding that respondent did not directly benefit from appellant's provision of feed to respondent's son and concluding that even if respondent had guaranteed the feed bill, that promise would be unenforceable under the statute of frauds?

## ANALYSIS

### I

■ Mitchell Feed & Seed argues that the trial court's finding that Bud Mitchell did not orally guarantee his son's feed bill was manifestly contrary to the sheer weight of the evidence. Specifically, Mitchell Feed & Seed relies on the testimony of three witnesses—Bob Mitchell, Harley Privette, and Robert Ernhert—as proof that Bud Mitchell had in fact made an express guarantee.

Because the trial court did not credit Bud Mitchell's initial denial that the spring 1982 meeting had occurred, Mitchell Feed & Seed argues that his testimony on the substance of that meeting must also be discredited. However, the trial court's findings in both instances are supported by evidence in the record, and the apparent inconsistency can be resolved by bank officer Privette's testimony that the parties to the meeting arrived at a specific plan by which Kent Mitchell's feed bills would be paid with funds from the bank loan.

Similarly, the trial court was entitled to disregard testimony that Bud Mitchell had guaranteed the feed bill and believe the contrary testimony of Bud Mitchell. The trial court was not required to believe Privette's testimony that Bud Mitchell's guarantee was unqualified, because Privette also testified that there was no discussion of a direct payment of the feed bill by Bud Mitchell.

■ Finally, the trial court was entitled to overlook or discredit evidence that Mitchell Feed & Seed relied exclusively on Bud Mitchell's credit in supplying feed to

Kent Mitchell. That evidence consisted solely of oral testimony, the credibility of which is determined by the finder of fact. Evidence consisting entirely of oral testimony will be disturbed only in the most unusual circumstances. *Fidelity Bank & Trust Co. v. Fitzimons,* 261 N.W.2d 586, 589 (Minn.1977).

The findings are not manifestly contrary to the evidence, and we accordingly affirm the trial court's finding that Bud Mitchell did not orally guarantee the payment of his son's feed bill.

## II

The trial court found that Bud Mitchell had no financial interest in his son's operation and that he received no direct or primary benefit from the sale of feed to his son. Based on this finding, the court concluded that any alleged guarantee of the feed bill would be unenforceable under Minn.Stat. § 513.01(2) (1982), which makes oral promises to pay the debts of third parties unenforceable. In construing this section of the statute of frauds, courts have distinguished between "original promises," which fall outside the statute and are therefore enforceable, and "collateral promises," which require a writing to be enforceable.

■ Whether a promise is original or collateral depends upon the mutual understanding of the parties. *Esselman v. Production Credit Association of St. Cloud,* 380 N.W.2d 183, 187 (Minn.Ct.App.1986) (citing *Davis v. Patrick,* 141 U.S. 479, 489, 12 S.Ct. 58, 60, 35 L.Ed. 826 (1891)), *pet. for rev. denied* (Minn. Mar. 21, 1986). That determination is an issue of fact ordinarily left to the jury. *J.J. Brooksbank Co. v. American Motors Corp.,* 289 Minn. 404, 409–10, 184 N.W.2d 796, 799 (1971). Thus, in this case the trial court's conclusion that any guarantee would have been unenforceable implies a finding that it was a collateral promise.

Mitchell Feed & Seed first argues that the alleged guarantee was an original promise, because it relied entirely upon Bud Mitchell's credit in furnishing feed to Kent Mitchell. *See Amort v. Christoffer-son,* 57 Minn. 234, 59 N.W. 304 (1894). However, *Amort* is factually distinguishable. The defendant, Amort, told the plaintiff to give the third party the feed and "I will see you paid for it," *id.,* but in this case Bud Mitchell allegedly promised only to "stand behind" his son's feed bill. The facts of *Amort* present a much stronger case for finding that the plaintiff relied entirely on the promisor's credit in furnishing the feed. In this case only Bob Mitchell's testimony supports Mitchell Feed & Seed's contention that it relied solely on Bud Mitchell's credit in providing feed, and that testimony is discredited by the fact that Mitchell Feed & Seed obtained a judgment against Kent Mitchell before bringing this suit against his father.

■ Mitchell Feed & Seed also argues that the promise was original and thus outside the statute of frauds because Bud Mitchell had an interest in the provision of the feed to Kent Mitchell. When the leading purpose of the promisor is to further his own interests, rather than merely to accommodate the debtor, the promise is enforceable despite the statute of frauds. *See, e.g., Brooksbank,* 289 Minn. at 408–09, 184 N.W.2d at 799; *Burkel v. Pro–Vid–All Mills, Inc.,* 273 Minn. 297, 300, 141 N.W.2d 143, 146 (1966). The requirement is designed to prevent the tendency of creditors to "torture mere words of encouragement into an absolute promise." *Esselman,* 380 N.W.2d at 187 (citing *Davis,* 141 U.S. at 487–88, 12 S.Ct. at 59–60).

The trial court found that Bud Mitchell was only incidentally, and not primarily or directly, benefited by the provision of feed to his son. *Cf. Esselman,* 380 N.W.2d at 187. The finding that Bud Mitchell was not "primarily" benefited by the provision of grain to his son implies a finding that his primary object in making the alleged guarantee was to accommodate his son. The trial court's failure to state explicitly that Bud Mitchell's primary purpose in making the guarantee was to accommodate his son does not require reversal. *Cf. Peterson v. Johnston,* 254 N.W.2d 360, 362 (Minn.1977) (citing *Caroga Realty Co. v. Tapper,* 274 Minn. 164, 143 N.W.2d 215 (1966) (review-

ing court not required to reverse merely because findings could have been more detailed)).

Mitchell Feed & Seed relies on *Marckel Co. v. Raven,* 186 Minn. 125, 242 N.W. 471 (1932), for the proposition that an insubstantial personal benefit suffices to take a promise out of the statute of frauds. This reliance is misplaced. *Marckel* involved a promise to pay a pre-existing debt if the creditor would refrain from bringing garnishment proceedings to recover the money. The promise in effect created a new contract by exchanging the promisor's promise to pay for the creditor's promise to refrain from collection proceedings. In those circumstances, the court essentially declined to question the adequacy of the consideration involved in the new contract. *See also Rolfsmeyer v. Rau,* 198 Minn. 213, 269 N.W. 411 (1936) (promise to pay pre-existing debt is taken out of the statute if the transaction involves fresh consideration).

By contrast, Mitchell's alleged promise was given before the debt was incurred. The alleged promise to "stand behind" Kent Mitchell's debt tends to illustrate that the alleged guarantee was a collateral promise made to accommodate Kent Mitchell, rather than an original undertaking by Bud Mitchell on his own behalf.

The trial court's conclusion that Bud Mitchell's primary purpose in making the alleged promise would have been to accommodate his son is adequately supported by the record. The benefits which Mitchell Feed & Seed claims inured to Bud Mitchell by reason of the provision of feed to his son are minimal and indirect: the satisfaction of his desire to have his son farm; the fact that his own borrowing ability would not be impaired by the execution of a written guarantee; his relief from having to support his son; and the security of a second mortgage allegedly held by Bud Mitchell on his son's property. The trial court was well within its discretion in finding that such benefits were merely "incidental."

The trial court did not clearly err in finding the benefits to Bud Mitchell from the provision of feed to be incidental and concluding that the guarantee, if made, would have been unenforceable under the statute of frauds.

### III

Bud Mitchell also filed a notice of review from the trial court's denial of his motion for amended findings. However, because the challenged finding does not affect the result, it will not be reviewed on appeal. *Caroga,* 274 Minn. at 170, 143 N.W.2d at 220 (citing *Corah v. Corah,* 246 Minn. 350, 75 N.W.2d 465 (1966)).

### DECISION

The trial court did not err in finding that Bud Mitchell did not guarantee the payment of his son's feed bill and concluding that such a promise would have been unenforceable even if it had been made.

Affirmed.