James H. Weed and another *vs.* Little Falls & Dakota Railroad Company and others.

## October 3, 1883.

Corporation — Suit by Stockholders to restrain Issue of Stock and Bonds for Fraud and Ultra Vires—Plaintiffs held to be in Pari Delicto.—Certain directors of a corporation owned stock therein in partnership with these plaintiffs. At a directors' meeting they consented to the making, by the corporation, of a contract, which, by this action, the plaintiffs seek to have avoided, on the ground that it is fraudulent as to stockholders. The directors referred to consented to the contract, relying upon assurances exacted by them in behalf of the partnership, and with its knowledge, that they should be allowed to participate in the transaction to which the contract related, and to share in the profits expected to be secured thereby from the corporation. The partnership subsequently sought to avail itself of the benefits of the transaction in accordance with such assurances.

The principle that a court of equity will not, at the suit of a party to a fraud, grant affirmative relief from such fraud, *held* applicable to the case, and to preclude the granting of the relief sought.

Evidence considered as sustaining the facts found.

Plaintiffs, on behalf of themselves and all other stockholders of the defendant corporation aggrieved by the proceedings complained of, and who should come in and contribute, etc., brought this suit in the district court for Ramsey county, to restrain the company, its directors and officers, from issuing or transferring to the defendants De Graff & Co., Henry Villard, or W. H. Starbuck, and to restrain the last-named defendants from receiving, under the contracts mentioned in the opinion, any of the unissued stock or mortgage bonds of the

company or any of its municipal aid, the complaint charging that the contracts were a fraud upon the plaintiffs and upon all the shareholders except the defendant Villard.

The action was tried by *Brill*, J., who found the facts stated in the opinion, and also the following:

The company was organized in 1879, to build a railroad from Little Falls, via Sauk Centre and Morris, to the western boundary of the state, a distance of about 130 miles. Its capital stock was fixed by its articles at $2,000,000, in 40,000 shares of $50 each, and the highest limit of its indebtedness at $1,500,000. In September, 1879, the then shareholders agreed with De Graff & Co. that the latter should subscribe for and receive, at their par value, 126 shares of the stock, (being a majority of the 250 shares then authorized to be issued,) and should have control of the organization of the company. This was done, and the defendant Crooks (a partner in De Graff & Co.) became president of the company, and so continued until July, 1881. De Graff & Co. were railroad contractors of large experience, and the agreement with them was made, and control of the company placed in their hands, in order to secure the building of the road. De Graff & Co. (by defendant Crooks) made unsuccessful attempts to induce the Northern Pacific Railroad Co. (to whose lines the railroad, when completed, would be a feeder) and other capitalists, to furnish means for building the road; and at length, in June, 1881, they sold their 126 shares to defendant Villard, (who had shortly before acquired control of the Northern Pacific Railroad Co.,) for $90,000. It was also in evidence that, in addition to paying this sum, Villard agreed to give to one Livingston, (who had aided De Graff & Co. in effecting the sale,) one-tenth of the profits which should be realized in building the road, and De Graff & Co. agreed to procure resignations of directors, and the election of Villard's nominees in their places, sufficient to give him a majority in the board. Those changes were effected at and prior to a meeting of the board held at St. Paul, July 4, 1881.

At this meeting the defendant Villard was present. The subject of the building of the road was informally discussed. There was evidence tending to prove, and the plaintiffs requested the court to find,

that Villard, in answer to questions from defendants Barnum and Simmons and another of the directors, stated in conversation and informally the plan by which he proposed that the road should be built, viz., that the mortgage bonds of the company should be issued to the amount of $20,000 per mile, and the balance of the unissued stock (39,768 shares) should be issued to the purchasers of the bonds, as a bonus "to float" the bonds, and the road should be built with the proceeds of the stock and bonds. And in the same conversation, after inquiries as to the effect of this issue of stock upon the value of the shares already issued, Villard assured the shareholders present that any shareholder in the company should be permitted to contribute ratably towards the cost of building the road, and receive a proportionate amount of the stock and bonds, and share proportionately with Villard in any profits to accrue from building the road under this plan, and stand in this respect on the same footing with him. In refusing to make this and the other findings specially requested by the plaintiffs, the court placed its refusal on the ground that the findings made covered all the issues, and the additional findings requested were, some of them, immaterial, and some of them matters of evidence.

At this meeting of July 4th, a resolution was passed, amending the articles of incorporation by fixing the highest limit of the company's indebtedness at "$20,000 for each mile of its line of railroad, or of any branch or branches thereof, including side-tracks, as the same may hereafter be located."

On August 4, 1881, was held the directors' meeting mentioned in the opinion. There was evidence tending to prove, and the plaintiffs requested the court to find, that the draft of the contract between the company and De Graff & Co. was first submitted, without any mention of the contract between De Graff & Co. and Starbuck, nor was the latter mentioned until Barnum and Simmons had objected to approving the former contract, and then only for the purpose of removing those objections. Before Barnum & Simmons voted to approve the contract with De Graff & Co., they inquired whether Villard's assurance given July 4, 1881, to the minority shareholders would be fulfilled under the two proposed contracts, and they were then as-

sured on behalf of Villard and by his authority that he would carry out any assurances he had previously given; and Barnum and Simmons then voted to approve the contract, relying on the assurances so given, and on Villard's assurance given July 4th, and believing that all the shareholders would be entitled to contribute proportionally to the amount needed to carry out the two contracts, and share proportionately in the profit to be realized therefrom by the persons represented by Starbuck. The court refused to make this finding.

As conclusions of law the court held, *inter alia*, that the contract between the company and De Graff & Co. was not *ultra vires*, and not absolutely void; that the assent of Barnum and Simmons to the contracts, with knowledge of the facts, precluded plaintiffs from avoiding them; and that if Barnum and Simmons assented to the contracts, induced by the expectation of sharing in the profits of the contractor, then if the contracts are a fraud on the company, Barnum and Simmons are parties to the fraud, and the plaintiffs, who stand in the same position with them, cannot have relief in equity. Judgment was accordingly ordered for defendants, a new trial was refused, and the plaintiffs appealed.

*W. P. Warner* and *Geo. B. Young*, for appellants.

The construction contract is *ultra vires*. The original articles of the company limit its indebtedness to $1,500,000. Under this contract, an indebtedness of $20,000 per mile for 130 miles (or $2,600,-000) is incurred. The attempted amendment of the articles at the meeting of July 4th is invalid. An article limiting the indebtedness to "$20,000 per mile, including side-tracks," of a railroad not yet located, does not comply with nor fulfil the purpose of the statutory requirement that the articles of a corporation shall express "the highest amount of indebtedness or liability to which said corporation shall at any time be subject." Gen. St. 1878, *c.* 34, § 3.

The evidence shows that Villard, when he bought the 126 shares of De Graff & Co., meant to secure to himself the profits to accrue from building the road under the scheme embraced in the two contracts, and that he never meant to keep the promise made to the minority shareholders at the meeting of July 4th. The scheme, then proposed, of building the road from the proceeds of bonds and stock,

with the right secured to each stockholder to contribute *pro rata* to the cost and share *pro rata* in the profits, involved no fraud on any shareholder. And while the scheme in fact planned by Villard, and embraced in the two contracts, is a fraud upon the minority shareholders, that is not the scheme to which Barnum and Simmons assented by their votes at the August 4th meeting. The scheme then set before them, and to which they assented, did not consist in these contracts alone, but in the contracts *plus* the assurance and promise made by Villard on July 4th, and reiterated by his representatives at the August 4th meeting, and this scheme protected the rights of all the shareholders.

In the letter of August 5th, (quoted in the opinion,) Barnum and Simmons wrote not as directors but as stockholders. At the meeting of the board, they, as directors, had secured assurances, in which they believed, that every shareholder would be protected in his rights. It was no part of their duty, nor had they the right, to make an offer on behalf of any stockholders, except themselves and their partners, to contribute to the cost of building the road. Owning 59 out of the 232 shares, they asked in that letter, not that the benefits of the contracts be confined to their 59 and Villard's 126 shares. They did not ask 59-185. They asked merely for one-fourth, offering to pay one-fourth the cost, leaving it open to every other of the minority shareholders to avail himself of his own rights, and trenching on none of those rights. They asked nothing that belonged to any other shareholder—nothing that belonged to Starbuck or Villard. They asked for their share of what belonged to all the stockholders—what they were entitled to as stockholders, independently of any promise, as well as under the promise made to all the stockholders. In all this they were guiltless of any fraud in conduct or intent.

*W. P. Clough,* for respondent, argued that the limitation of indebtedness required to be expressed in the articles, does not include bonds secured by mortgage. Gen. St. 1878, c. 34, §§ 3, 70; and that the contracts were valid in every particular, and had, moreover, been ratified by the plaintiffs, by Barnum and Simmons.

DICKINSON, J. The facts of the case, as found by the court upon the trial of the cause, are in substance as follows:

The plaintiffs are stockholders in the Little Falls & Dakota Railroad Company. The amount of stock authorized by the articles of incorporation was 40,000 shares. At the date of the transactions complained of, August 4, 1881, only 232 shares had been issued. Of this amount the defendant Villard had purchased and held 126 shares. Thirty-six shares were then held by a partnership consisting of these plaintiffs, the defendants Barnum and Simmons, and three others. A short time after the above date the partnership acquired other stock, making the whole amount owned by it 59 shares. The defendants Barnum, Simmons, Villard, and Starbuck were directors of the corporation.

Prior to August 4, 1881, Villard had caused to be prepared, in form for execution, two contracts, both bearing the same date and being parts of one transaction or scheme. In one of these the defendants Crooks and De Graff, who were partners having the partnership name of De Graff & Co., were the parties of the one part, and the railroad corporation defendant the party of the other part. By its terms De Graff & Co. were to construct and equip the road of that corporation, in consideration of which the corporation was to issue to them for each mile of constructed road 331 shares of its capital stock, and its bonds to the amount of $20,000 per mile, securing the same by mortgage of all its property and franchises; also, to assign to De Graff & Co. all municipal securities which should be issued in aid of the construction of the road. Such securities had then been voted with legislative authority, but upon certain considerations, to the amount of $164,800.

In the other proposed contract, the contracting parties named were De Graff & Co. and the defendant Starbuck. By its terms De Graff & Co. sold and assigned to Starbuck all the stock, mortgage bonds, and municipal securities which they were to receive under their contract with the railroad company. Starbuck was to pay them $5,446 for each $20,000 of mortgage bonds, with the accompanying 331 shares of stock. He was also to pay certain specified sums for extra work in construction, and to provide a large amount of material to be used in construction and equipment of the road. Villard was in-

terested with Starbuck in this contract, and was to receive some share of the stock and bonds referred to therein.

The actual cost of construction and equipment, as provided in the De Graff contract, would not exceed $14,000 per mile, nor would it cost Starbuck more than that sum to carry out his contract with them. The bonds and stock to be issued to De Graff & Co., and by them transferred to Starbuck, will, upon the completion of the road, considerably exceed in value the cost of such construction and equipment.

A meeting of the board of directors was held August 4, 1881, at which Barnum and Simmons were present. Villard and Starbuck were not present. At this meeting the proposed De Graff contract was presented at the instance of Villard, who sought from the board authorization for its execution on the part of the corporation. Such authority was conferred by a unanimous vote of the directors present. After this authority had been conferred, the resignations of Villard and Starbuck as directors, which had been sent in to be presented at this meeting, were accepted, and other directors named by Villard were elected in their stead.

The two contracts were executed by the parties named therein respectively. At the time of the action of the board of directors above referred to, the entire transaction embraced in the two proposed contracts was understood by all of the directors present. Barnum and Simmons, before they voted in favor of the execution of the construction contract, required assurances to be made in behalf of Villard that they should be permitted to share in the benefits to be derived by Starbuck and Villard from the transaction. In requiring such assurances they acted in behalf of the partnership of which they and these plaintiffs were members. All of these partners knew of the assurances so given, and of the approval of the contract by the board. Relying upon the assurances given to Barnum and Simmons, the partners were satisfied, and immediately afterwards sought to avail themselves of the supposed benefit accruing to Starbuck and Villard from the transaction, seeking to be allowed to contribute one-fourth of the cost of carrying out the contract between Starbuck and De Graff & Co., and to receive a corresponding proportion of the bonds

and stock. Their proposals in that respect were rejected. Sixteen shares of the stock held by the partnership having been by it transferred to these plaintiffs individually, this action was commenced in their behalf, as well as in that of other stockholders; the relief sought being an adjudication that the contracts were fraudulent and void, and an injunction against the contemplated issuing of the bonds, mortgage, and stock, and the transfer of the same, and of the municipal securities as provided in the contracts.

The court has not in terms found the transaction complained of to be fraudulent, but from the facts found the conclusion of fraud cannot well be avoided; and, for the purposes of the case, we assume that the transaction was a fraud as to stockholders not consenting to it, for the reason that the corporation was made to assume obligations, by the issue of its bonds and stock, largely in excess of the amount necessary to raise money sufficient for the construction and equipment of the road; the difference between the actual cost of the work and the value of the stock, bond, and municipal securities, being really gratuitously bestowed by the corporation upon Starbuck and Villard.

At the threshold, however, stands the maxim that "he who comes into equity must come with clean hands." A court of equity will not, at the suit of a party to a fraud, grant affirmative relief from the consequences of it, but will leave the parties in the position in which they have placed themselves. This rule is applicable to the case before us, and precludes the granting of relief at the suit of these plaintiffs, if the facts found by the court, as to the action of Barnum and Simmons in authorizing the execution of the contract, and the participation of the plaintiffs in the transaction, are sustained by the evidence.

It is claimed, however, that the findings are not justified by the evidence; that the assurance sought by Barnum and Simmons, and given to them, and relying upon which they voted in favor of the making of the contract, were to the effect that *any* stockholder might share in the enterprise. We will not consider whether, if this had been the fact, the transaction would not still have been a fraud upon stockholders. We deem the findings of the court sustained by the

evidence. It appears that, prior to the meeting of August 4th, the contemplated scheme of issuing stock and bonds for the building of the road, to the amount named in this contract, was disclosed by Villard to Barnum, and came also to the knowledge of Simmons; that these would be worth in market about their face value, while the road could be built for about $13,000 per mile, leaving a profit of about $7,000 per mile to those who should acquire the bonds and stock, and furnish the money necessary for construction. Barnum was encouraged by Villard to form a pool here, and the assurance given that he, Villard, would help him. Upon such assurance, Barnum and Simmons proceeded to form the partnership of which the plaintiffs became members, for the purchase of stock, and with the purpose, as we think is apparent, of securing the benefits which the proposed arrangement promised. The nature of the scheme was made known by Barnum and Simmons to their associates in the partnership. At the time of the August meeting it was understood that, under the proposed contracts, the stock and bonds were to be transferred absolutely to De Graff & Co., and by them to Starbuck; Villard being also interested in them. It must have been understood that the contemplated transaction would leave stockholders without any power to acquire the new stock or the bonds, except as Starbuck or Villard should grant them the privilege of doing so.

That Barnum and Simmons, at the August meeting, required and obtained assurances in this respect only for themselves, and not in behalf of stockholders generally, and that they were induced by such assurances to consent to the contract, is strongly indicated by their own declarations, which are also legally imputable to these plaintiffs. In a letter written on the 5th of August by Barnum and Simmons to Villard, with the knowledge of the partners, at their instance, and in their behalf, this language is used by the writers whose names are subscribed: "In consequence of a conversation between yourself and Mr. Barnum, to the effect that if we should form a pool you would assist us, we have formed one, and by the assistance of a few friends are enabled to contribute or share towards building the road, and can furnish it as required by the contract. Before the passage of the resolution yesterday, accepting the contract, we were assured * * *

that you would permit us to furnish our share of the money necessary, and that we would receive the bonds and stock therefor on the same basis as yourselves or friends. Trusting implicitly in the promise and assurance, we most cheerfully indorsed the acceptance of the contract."

We find also evidence leading to the same conclusion, in the negotiations upon this subject at the directors' meeting of August 4th, but will not extend this opinion by reciting it. Not only does the evidence tend to charge the plaintiffs legally as parties participating through Barnum and Simmons in the making of the alleged fraudulent contract, but it places them in the position of having ratified the transaction with a knowledge of the facts, by seeking to obtain for themselves the fruits of it. It sustains the facts found by the court, and, for the reasons above stated, upon these facts these plaintiffs are not entitled to relief in equity.

Order affirmed.